Case number 15-5645, Barbara Perry v. American Red Cross Nashville, et al. Arguments not to exceed 15 minutes preside. And Mr. Allman, for the appellant, you may proceed. Good morning. Good morning. Your Honor, it's Andy Allman for Ms. Perry, and I'm reserving 5 minutes for rebuttal. Right. Your Honor, we are here this morning to ask you to reverse the trial court's summary judgment on three issues. Discrimination under the Americans with Disabilities Act as it pertains to Ms. Perry's termination, the summary judgment ruling on the retaliation for taking FMLA, and the summary judgment ruling for Ms. Perry's claim of interference under the FMLA. Ms. Perry brought this to action originally arguing that she was a qualified individual under the Americans with Disabilities Act as amended, or that her employer regarded her as being disabled. We think there was sufficient evidence in the record to allow a jury to determine whether or not the employer, number one, regarded her as being disabled, and two, whether or not her disabilities that they regarded her as having or that we feel that she had was the reason that the company terminated her. In the record, substantial evidence that Ms. Perry suffers from numerous serious medical conditions, starting kind of chronologically, obviously, was the issue with her foot that the company dealt with, her taking leave on. Also, was confronted with Ms. Perry making requests for accommodations. Now, we don't necessarily argue that that is a discreet act for which she can bring an action because of its time, but what we are saying is it starts a pattern of notice that the company understood that this was an employee who had... Doesn't someone with a disability still have to comply with the absent policy, in other words, getting permission when you're not going to come to work? That is true, and that kind of leads us to the pretext. Didn't the company apply that policy to quite a few other people, right? I don't know the exact number that the company... It was eight. Okay, the record may show that it was eight. But when we start talking about applying the absenteeism policy to Ms. Perry, we talk about it in the context of a pretext argument under the ADA and the FMLA. And what makes this case, in our opinion, sufficient to go to the jury is that the company had an employee who had been applying for and been approved for intermittent FMLA. True, and on those occasions, she had done what is required by the employer's policy, usual and customary notice and procedural requirements. But on these occasions, she didn't. Well, we would disagree. We think that the proof shows that Ms. Perry was calling in to say that she was going to be absent. Now, there is a change in how the Red Cross handles FMLA or absenteeism. I believe sometime in the spring of 2012, if I'm not mistaken, that we now have a third-party individual that we now have to contact and let know that we're taking FMLA. But she's calling in... You're allowed to do that, though. Absolutely. But she's calling in and telling them she's going to be absent. She's bringing them a doctor's note. She's telling her employer, not the independent agency, AON, or whatever it's called. That's correct. But that gets started relatively close in time to her actual termination. But let's assume that she does not call the correct person. Where is the corrective action? Where is the disciplinary document? Where is the write-up or the counseling? Where is this implementation of a progressive disciplinary policy the company touts when it talks about the fact that she had X number of absences and was terminated? So these other eight folks that suffered from the same policy, is there evidence that they were given what you're talking about? That would be evidence of pretext. In other words, that would suggest there was this counseling, there was this interim discipline. Did that happen to the other eight? I'm not aware as I stand here that all eight of those received that type of progressive disciplinary policy. How about any of them? I don't know that, but I think Ms. Perry is different because the absenteeism policy can be applied by the employer, but it can't be used to violate the law. It can't be used to interfere with an employee's ability to take FMLA. She's already been approved for intermittent FMLA for the very conditions she's missing work for. And so she's calling in and saying, I'm not going to be there, here's my doctor's note. Her supervisor is testifying that I'm just taking the doctor's note and I'm just cramming them in a file. Now the FMLA law is clear that when an employer gets knowledge that an employee is incurring absenteeism from a medical condition that's going to require or might require FMLA, that employer has an obligation of due diligence to investigate further. The employer at this point never did any of that. The employer at this point just simply said, she's called in, she's out sick, we don't care if there's a doctor's note. We're going to, under the negative factor analysis that this circuit adheres to, charge that against her. The FMLA can't be used as a sword by an employer to carve out a legitimate non-discriminatory reason to terminate an employee. And that's what the employer has done in this aspect. Why was the FMLA being used as a sword? I thought what was being used as a sword was an absenteeism policy. I agree that that's a sword, but I thought it was a legitimate sword. Not when it's used to inhibit or deprive an employee of the right to use FMLA. Because she's already approved for intermittent FMLA when she starts having these absences. I mean, there's already record that the company has said, I think they called it intermittent, unknown, unplanned medical leave for her condition. So what the employer then does is say, wait a second, we're going to ignore our approval of her intermittent FMLA. Now she's having absences. So we're just going to document those as a negative factor in running her through this disciplinary absenteeism policy to terminate her. It would be different. This is not the facts, but I would have thought this is how it worked. Let's say your father or mother is in real health trouble. You say, I'm going to need to care for him or her pretty regularly. It's going to last as long as they live. And the company says, that's fine. That's a good explanation. All we need from you is notice the night before, ideally the week before, but at a minimum notice the night before that you can't come in and we've got it covered for you. And if you do that, you're good. You're covered. It's all good. But if you don't do it, I would have thought they can say sorry. I mean, this is not how it works. You've got to give us notice and you've got to tell the right person. You've got to notify that person. And if you don't, it's going to cut against you on the absenteeism policy. And after a certain number, we're going to do what we do to everyone else. And I think Your Honor is correctly drawing a distinction between no call, no show, and as the company has argued, excessive call-ins. I mean, she's calling in. She's then providing a doctor's note whereby the employer has evidence that it relates to the FMLA leave. I mean, if the employer approves the FMLA leave intermittently, I don't think the employee is required by law to call the night before. Something may happen that morning. They may have an event and they call in. I thought there was also a question about whether the nature of the problems were related to the reason that FMLA leave was sought. In other words, again speaking hypothetically, if you say you're going to need FMLA leave to take care of your ill parents and then you are absent because you have a cold, that would not necessarily qualify you for intermittent FMLA leave. There's no evidence in the record that the employer did any kind of investigation to determine that Ms. Perry was not being honest or not asking for legitimate time off when she took FMLA. She applied for FMLA. They gave it to her intermittently. She brought a doctor. Mr. Moore is referring to some of the absenteeism violations. The days she didn't show up, she doesn't say it was because of an FMLA-related explanation. I thought there were some of them that had nothing to do with the explanation. I think there are doctor's notes for all but two. You're saying a doctor's note for anything, even if it's unrelated to the original reason why the employer gave intermittent FMLA leave will qualify you for FMLA leave. I don't know the answer to that question from a legal perspective, but from what I understand from the record is that she put them on notice either verbally or in writing what she was dealing with. There are instances where her supervisors, decision makers, they're witnessing her having events. When she goes and gets a doctor's note for one of her events, she turns it in and it describes how she's affected by one or more of the conditions that she's having. I think it's important to note, if they had just excused one of her absences that she had a doctor's note for, she would have never been terminated. And I am out of time. I apologize. Thank you. Good morning, Your Honors. May it please the Court, my name is Mike Graziano. I'm representing the American National Red Cross. I think the Court has honed in on what's really the issue at the center of this case is is the Red Cross entitled to enforce its usual and customary notice requirements and is that what occurred in this case? The answer to the initial question, is the Red Cross entitled to enforce those notice requirements, is absolutely yes. It's in the EEOC regulations and it's in this Court's prior precedents, including a published opinion in Schroeder v. Dana Light Axle Manufacturing, which has facts that are somewhat similar to this case in that there was some interaction, actually similar to this case, but there's more evidence about communication by the employee to the employer in that case with regard to a medical condition that would potentially be FIMLA qualifying, that this individual is going into surgery for a hernia. And the Court said that because the individual didn't call in every day that he was going to be absent as he was required to do, the company could terminate him for absenteeism without violating the policy. That's essentially what happened. What would have happened to her in this case? Everything else is the same, but she just wakes up one morning with the flu, and let's say she called, so she says, you know, I'm sick. Would that have been a pre-approved and it would have been fine to stay home, or would you have said, well, you can stay home, but it's going to count as one of your seven absences? Well, the way it worked is the employees are required to call to do two things, make two phone calls. One is to call the supervisors who are on site, who are setting the schedule. Let's say she calls everybody she's supposed to call. She's got a doctor's note. Would that have counted as one of the seven, or would you have said, well, no, if you have the flu, stay home, fine, thanks for calling? Well, what would have happened if she calls Ann Hewitt, what Ann Hewitt would have done with the information is make a determination as to whether it was ephemeral qualifying. They might ask her for a medical certificate and engage in a process with her to determine if she's entitled to medical leave. That's what didn't happen in this case because she didn't make those phone calls. What would Aeon have said had she made that phone call in this case and it was the flu? Just a one-day pretty serious case of the flu. I think the answer depends on – I can't answer for them. I mean, it would depend on their analysis of whether the flu is a serious health condition that would qualify under FMLA. If it's not, it wouldn't be marked down. Weren't there some sick days available too, or is that not part of the Red Cross policy? No, the way the policy works is all – it makes the first distinction between scheduled and unscheduled leave. So if you have scheduled leave in advance and taking a vacation and it's approved, there's theoretically no limit on that. If you ask a month in advance, I'm going to take this time off. If you have an unscheduled absence, which is typically what happens when somebody's sick or some family circumstance arises, you could have – it was a progressive policy. So at 4, the discipline procedure kicks in at 4 during a rolling 12-month period, the discipline policy. If somebody gets the flu repeatedly because they happen to have an immune compressed thing, once they have hit 4 unscheduled days, the discipline policy comes in? Yeah, in the form of a verbal warning. Hey, you have 4, be aware of our policy. If you get up to 7 of these, then it's a termination. And that's assuming that the absences, even unscheduled absences, sometimes are excluded from the disciplinary procedure, but the flu would not be one of them unless it was protected by FIMLA. An example of something that's protected is FIMLA. Jury duty, some sort of – something that the law would require, some kind of military duty, being called up for the reserve, something along those lines. But a normal sickness, a common cold. So in answer to Judge Daughtry's question, there are no 6 days, I mean except there's 7, I guess, technically. There's 7 6 days. That's the way to think about it. And after 4, you're going to get, quote, disciplined because maybe you're married to an elementary school teacher and there's viruses all over the house. Yes, that's correct, and it might seem strict, but that doesn't make it discriminatory and that doesn't make it legitimate. I don't think I've ever heard of an employer that didn't give employees some number of 6 days, usually calculated by, you know, how many days they work. You work 4 weeks, you get a sick day. If you don't use it and you work 4 more weeks, you've banked 2 sick days. There was no policy like that at the Red Cross in Nashville? No, there's not. But they can ask for FIMLA leave. Yes, well, they can call. And then they have to meet the qualifications for FIMLA leave. That's correct. But FIMLA leave doesn't pay you. Right. And you have no paid sick leave at all? And after you've amassed 4 sick days, the disciplinary process hooks in? Well, my understanding of it, and I think Judge Sutton was getting at this, is that the 4 days would be paid, sick days essentially, and then once you get to 7, it's termination. Well, FIMLA doesn't, you take FIMLA leave, you don't get paid. Well, that depends on the employer's policy because some employers will pay if you have PTO saved up or something like that. And I'm not sure how this policy works. I believe that if you had FIMLA and you were still within your number of scheduled absences that you would be paid for it. Aren't I right in thinking the FIMLA is not going to apply to the flu? Some people get the flu for like 3 days. I mean, they're vomiting for 3 days, so that's 3, 3 done with that. And so you get the flu twice, you've got a serious problem on your hands. That's right. That's the policy. It's the Red Cross. You need the Red Cross for the Red Cross. We'll bring the Red Cross from Columbus. We'll help the people at the Red Cross in Nashville. The other irony is that these people are serving people in a medical context and so the natural tendency of the person with the flu would be to come in and work so that they wouldn't get fired. Work with needles and everything else. So in your estimation, talking about her FIMLA claim, what is the fatal flaw that causes her to be fireable? The fatal flaw is that she didn't follow the notice procedures. And the notice is that she did notify the supervisor, but she didn't notify AON. Yes, and I take issue with something that counsel for the appellant said about the way the notice occurred with the supervisors. She did notify the supervisors, as far as I'm aware, for all of these absences. I'm not going to be in so they could deal with scheduling. But the idea that the record has doctor's notes that support that she had something that's potentially FIMLA qualifying in all these instances, or in any of these instances, is just absolutely not true. She did have doctor's notes, though. For a few of them. There's one that was from a dentist that doesn't say what she was undergoing. I can only assume it's a normal dental procedure. I don't think that having seen a dentist on one day and being out for that morning. Well, it all depends what the dentist does. I suppose it does. But there's certainly nothing in the note that suggests. And she showed up to work the next day. So I don't think that there's anything to put anybody on notice, even if the Red Cross couldn't enforce its call-on requirements and say you were supposed to call this person, you didn't do it. There's one other doctor's note that is from, I can't remember which physician it's from, but it doesn't say anything about just she was seen on this day and that's it. So part of the policy is that in order to qualify under their FIMLA policy, she has to produce doctor's notes for each event? Is that what you're saying? No, no. She was approved twice for intermittent leave, and those approvals were in place at the time of some of the absences, at least. This gets to the question that I've been asking a couple times. Does her absence have to relate to the basis for which the FIMLA leave was approved? Yes. So she was approved for essential tremor. So if she calls Aeon Hewitt and says, I need to use one of them, she had already done this. She was aware of the policy. She had been told three times that every absence after you get intermittent, you have to call Aeon Hewitt and tell them about it. What she would do is call Aeon Hewitt and say, hey, here's my claim number. I have the approved FIMLA leave, which she had, and I'm going to be absent today for this reason. She did call Aeon. No, she did not. That's what she was required to do, and she failed to do it. But she called her supervisor. And then was she told after the fact so that then she could properly do things in the future? Was she told, hey, you called your supervisor, but you didn't call Aeon? I don't think there's any evidence in the record that there was any knowledge on the part of the decision makers. The way it's set up is the supervisors are managing scheduling, so they need to know for that purpose, and then they manage the discipline. Aeon Hewitt is managing all the other aspects of the policy, and they're not communicating on a daily basis. But after the four events, then was she told, hey, you're not calling Aeon and you should have been calling Aeon? I would have to look. I cannot be sure as I stand here how the process worked. She had several. She was, for years, for a couple years, she was on the verge of violating the policy to the point of having seven absences. She'd been warned a number of times, and I think she was already at five or six when the Aeon Hewitt policy went into place. So at the times that those warnings, and I can't be sure of the dates of all of them without looking, but the times, certainly, of most of the warnings, that that wasn't a requirement. It was something that came in later. So it's not something that anybody was neglecting to tell her because that wasn't the policy at the time. The way she was informed about the policy was threefold. When Aeon Hewitt first started processing the leave, all the employees received an email. She admitted she received. It said you have to call Aeon and your manager. She also received a flyer that all the employees received, and I believe it was posted, that gave the same information. And then both times, so it was actually four times, both times that she was approved for intermittent leave, she gets a letter from Aeon Hewitt saying, you've been approved for your request for intermittent leave. Here's the information you need for each time you need to use this leave. And it's in the record. It's a notice that says how to report intermittent absences. It's one page, and it says you have to make both of these phone calls. You have to call Aeon and give them this claim number. This is what you do. And she didn't do that, but I don't. There's nothing in certainly the warning letters to answer your question that says that you have to do this, but it's just not really a part of the way it was administered. It's not a progressive discipline policy in the sense that she was doing something that was a job performance issue or something along those lines that you say, hey, that's progressive discipline, right? I am performing poorly, getting customer complaints, and my boss comes to me and says, you're getting these types of complaints. This is what you need to do to fix it. Nobody knew that she had FIMLA qualifying reasons. There's no reason to tell her that you're not calling Aeon because it just doesn't bubble up as an issue. Well, it seems like such a perfunctory thing to call Aeon. So you could argue it both ways. You could argue if it's so perfunctory, why didn't the employee do it? But if the employee's not aware that failing to call Aeon is critical to her retaining her job, then you could argue it from the other side and say, why didn't the employer, when the employer realized at item 6 or item 5 that she's not calling Aeon, why didn't the employer say, hey, you know, you're supposed to have been calling Aeon? I suspect it was a timing issue, but there's nothing in the record that one way or the other speaks to that. You're mentioning the record. Is the entirety of her deposition in the district court's record? We were having some trouble finding it, do you know? I believe that the – I only filed excerpts. I believe that the plaintiff filed the entire thing, but I did notice an issue on PACER when I was preparing the brief that it's not publicly accessible. One of the exhibits to the opposition, they filed a motion for summary judgment. That could be the issue. I'm really not sure. I'll ask the other side as well. I just wanted to give you a chance to tell me. How many employees are in – it's Nashville Red Cross? Yes. How many employees are in this particular facility? I couldn't say. I've been there. It's maybe a two-floor facility. So 50 or 100? Somewhere in that range, it would be my guess, but I'm just speculating. It seems like a lot of people that are losing their jobs over this policy. It might be almost 10% in 18 months. I couldn't speak to the numbers, but it is a large number. I think that it only goes to show that it's a policy that's being strictly and consistently enforced. There's no evidence, certainly, that any of those employees were disabled or had FIMLA-qualifying reasons or were being discriminated against for anything. It's a strictly enforced policy, and it might seem to be strict, but they're dealing with the public, so there's people coming in to donate blood, and they need to have staffing. And I understand that some of these regions, they've had problems in the past with having donors become angry because there's not enough people to serve them, and they have to wait for a long time. And that's why they put a big deal on making sure that people are there and doing what they're supposed to be doing. I have nothing else, unless your honors have questions. Thank you. Touching on the last thing that counsel said, that none of the other people, other than eight that's been applied to, had any record of any disabilities or family medical leave act. That's the point. There's not a problem with an employer enforcing an absenteeism policy consistently against the employment force as a whole. However, when you have an employee that you've already approved intermittent FIMLA, that you already are on notice who has disabilities or serious medical conditions, you can't then use that absenteeism as a checkmark against them to fire them in the policy. If that's the case, no employee in the country has FIMLA protection. Now, the question then becomes, when she calls in and says, I have intermittent FIMLA, which counsel has alluded to, she called in, and that gets to her manager, it gets to Ms. Holmes in HR. At one point, I think I heard counsel argue that AON had actually approved one of the FIMLA requests. The law shifts the obligation to the employer to do an investigation to determine if it's an FIMLA qualifying event. That was never done. They never, because Mr. Yock... So most of these unexcused absences happened before AON came in, right? Yes. It's not like there were five or six that had nothing to do with AON. So which one of those, let's forget AON for a second, which one of those was a situation where she called the right person, said, I'm qualified for intermittent FIMLA leave, I'm invoking it for tomorrow, and they still marked her as unexcused and counted it towards the seven? I would say every one of them. Well, you're saying every single absence... No, I must have misunderstood you. Prior to... Are you saying prior to AON coming on board, the leaves of absences she took prior to that? The ones that counted towards the seven, so it's five or six were already in the queue before AON starts, and I thought every single one of them was one where she didn't follow the absenteeism policy. So, I mean, I'm struggling. I mean, if you said she called, she had approval, they didn't then give her the day off, it seems to me you have a really good claim, but I didn't think that happened once. You're saying it happened every time. Well, I think, and I understand the confusion, when we start looking at the absenteeisms in May, that's after AON has come into the... My question was before. I'm trying to focus on before. I'm trying to eliminate the problem of which one to call, and I'm just asking which one of those, did she follow the absenteeism policy as well as the FMLA requirement, and yet they still chalked it up as an unexcused absence when she invoked the FMLA and her intermittent leave and notified them? As I stand here, I don't know the exact number of those where they actually said that counts against you. Tell me one. Just tell me one where they shouldn't have counted it. Before AON. Yes. I'd have to look back into my briefing and get the exact date. I don't know that exact date as I stand here. But back to what my original point was, the employer makes the argument in part of their brief that Ms. Perry did not call in and designate which absenteeism or which absence was FMLA and which was not. That's not the employee's obligation. The employee has to call in and say, I can't come to work because of my health condition. I've already been approved for intermittent FMLA. That's what I'm taking. If the employer disavows that, if the employer questions that, the employer has that obligation. That's yet another safety feature for the employee because as Your Honor noted earlier, if they had done that, Ms. Perry would have known her job was in jeopardy. But nobody told her. She didn't know that. Your friend on the other side said she'd run up against this number for several years. She was quite aware of this issue. But in her mind, she's calling in like she's always done with FMLA. Nobody's coming back to her from the employer saying, go get this medical certification done. We want to talk to you, Doctor, because we're not going to... I just don't understand what you're saying because I just asked you, what was the time she called in and they didn't excuse the absence? In other words, they should have because she called in. She says, I'm FMLA approved, and they still countered her against her. You can't tell me. It's not very helpful to keep talking about the FMLA when you can't identify one of the seven where she does what she's supposed to do and they don't do what they're supposed to do. That's what I can't grasp. I would start by saying those absenteeisms that started in May. But I understand Your Honor's question is, well, she didn't call Aeon. I don't think the records show she knew to call Aeon or that not calling Aeon was jeopardizing her job. She's done what she'd always done, called her manager, provide the doctor's notes. Thank you. Your red light is on. Thank you both for your argument. The case will be submitted. And would the clerk recess court, please.